**Marc P. Berger**
**Sanjay Wadhwa**
**Michael D. Paley**
**Judith A. Weinstock**
**Paul G. Gizzi**
**Kristine Zaleskas**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0077 (Gizzi)**
Email: gizzip@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) | **COMPLAINT** |
| Plaintiff, ) ) | |
| v. ) ) | **20-CV-00008** |
| KENNETH CIAPALA and ) BLACKLIGHT SA, ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants Kenneth Ciapala ("Ciapala") and Blacklight SA ("Blacklight" and, together with Ciapala, "Defendants"):

## SUMMARY OF ALLEGATIONS

1. During 2014 and 2015, Defendants violated the registration and antifraud provisions of the federal securities laws in connection with an unregistered offering and the manipulation of the securities of a microcap issuer, EMS Find, Inc. ("EMSF").

2. Defendants facilitated the deposit and sale of millions of shares of EMSF to the public, in violation of the registration provisions of the federal securities laws. The illegal offering and sales coincided with Defendants' pump-and-dump of EMSF securities in the spring of 2015, using stock deposited in domestic brokerage accounts, among others, and targeted at investors in the United States.

3. In or about late June 2015, when that pump-and-dump scheme began to wind down, Defendants embarked on a new scheme involving manipulative trading, including placing non-bona fide bids to give the false appearance of demand, to maintain and support the price of EMSF shares. The purpose of this manipulative trading was twofold: (a) to ensure that the price of EMSF shares was attractive to buyers that intended to purchase the shares at a discount; and (b) to enable the Defendants to liquidate some of their shares at the inflated price.

## **VIOLATIONS**

4. By virtue of the conduct alleged herein, Defendants violated Sections 5(a), 5(c) and 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)]. In the alternative to the direct violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)], Defendants aided and abetted violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)].

## NATURE OF THE PROCEEDINGS AND THE RELIEF SOUGHT

5. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

6. The Commission seeks a final judgment: (a) permanently enjoining Defendants from committing future violations of the above provisions of the federal securities laws; (b) ordering Defendants to disgorge any ill-gotten gains with prejudgment interest thereon, on a joint and several basis; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) prohibiting Defendants, pursuant to Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)], from participating in an offering of penny stock; and (e) ordering such other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act, [15 U.S.C. §§ 78u(d) and 78aa]. Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. A substantial portion of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York. For example, some of the investors who purchased EMSF stock during Defendant's stock manipulation resided in this district, and at least one of the funds that purchased EMSF stock from "Individual A," described below, used a broker-dealer located in this district.

8. In connection with the transactions, acts, practices and courses of business alleged

in this Complaint, Defendants, directly or indirectly, singly or in concert, made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

9. **Ciapala**, age 38, is a resident of Meyrin, Switzerland. Ciapala is one of the two co-owners of Blacklight. Prior to founding Blacklight, Ciapala worked at EuroHelvetia Trust Co., SA ("EuroHelvetia"), a wealth administration firm based in Geneva, Switzerland. EuroHelvetia provided services to microcap fraudsters similar to those now provided by Blacklight. Ciapala was born in Switzerland. He is also a citizen of the United Kingdom. Ciapala has never been associated with an entity registered with the Commission.

10. **Blacklight** is an entity located in Switzerland. Blacklight purports to be an asset management firm. In reality, Blacklight is in the business of facilitating securities fraud by partnering with clients, typically undisclosed control people behind microcap issuers, to obscure actual stock ownership. Blacklight provides numerous nominee entities and sets up multiple bank and brokerage accounts, which it manages on behalf of clients. Using its network of entities and accounts, Blacklight enables microcap fraudsters to hold huge stock positions, while evading reporting obligations, by creating the appearance that no person owns five percent or more of an issuer's shares. Blacklight is regulated by the Swiss Financial Market Supervisory Authority. Blacklight has never been registered in any capacity with the Commission.

## RELEVANT ENTITY

11. **EMSF** is a Nevada corporation headquartered outside Philadelphia, PA. Before March 20, 2015, EMSF was known as Lightcollar, Inc. It was quoted on OTC Link operated by OTC Markets Group Inc. ("OTC Link"). At all relevant times, it traded under the ticker symbol

4

"EMSF" and purported to be developing a mobile application to connect health care professionals and patients with medical transport. On June 19, 2017, EMSF changed its name to Integrated Ventures Inc. It continues to be quoted on OTC Link, now under ticker symbol "INTV," and it claims to be engaged in bitcoin mining. During the relevant period, EMSF was not a reporting company under Section 12(g) of the Exchange Act [15 U.S.C. § 78*l*(g)].

## FACTS

### EMSF Securities' Unregistered Offering and Manipulation

**A.    Unregistered Offering of EMSF Securities**

12.    In 2015, Ciapala, Blacklight and "Individual A," with assistance from EMSF's chief executive officer ("Nominee CEO"), who was under their control, engaged in an unregistered offering to sell EMSF stock.

13.    Individual A had been a client of Blacklight since at least April 2013, when he, using an alias, signed an "opening of account relationship" agreement with Blacklight. Individual A's EMSF activity began in early 2014, when he became part of a purchaser group that gained control of all the outstanding shares of EMSF.

14.    Beginning in April 2014, Individual A retained an attorney ("Attorney") to work with EMSF's transfer agent to transfer all of its shares held in the names of EMSF's original (apparently straw) shareholders, who purportedly bought their shares from the issuer in a transaction registered on a Form S-1, to a control group consisting of Nominee CEO and Nominee CEO's spouse, as well as to false identities controlled by Individual A or, among others, nominee entities set up for Individual A by Blacklight and Ciapala (the "Control Group").

15.    In his communications with the transfer agent, Nominee CEO instructed that the new stock certificates be sent to either Blacklight or himself.

16. Throughout 2014 and early 2015, Individual A and Blacklight (acting through Ciapala) provided paperwork required by the transfer agent for new stock certificates, including stock purchase agreements and the existing stock certificates to be cancelled.

17. By the summer of 2015, all the outstanding shares of EMSF were held and controlled by the Control Group, including the shares deposited at the nominee entities provided by Blacklight, specifically Abington Capital Inc. ("Abington") and Wynford Ltd. ("Wynford"), for which the share certificates were mailed to Blacklight.

18. On March 19 and May 6, 2015, Wynford received a total of 1,250,000 EMSF shares. On April 22 and July 1, 2015, Abington received 2,050,000 EMSF shares.

19. Abington's and Wynford's holdings constituted approximately 11 percent of EMSF's outstanding shares. (As of March 17, 2015, there were 28,250,000 EMSF shares outstanding, with 18,250,000 of these shares purportedly unrestricted.)

20. After Ciapala and Blacklight had possession of the stock certificates in the names of Wynford and Abington, Ciapala arranged for the shares to be deposited in various offshore broker-dealers.

21. Specifically, Blacklight deposited these shares in accounts Blacklight managed and controlled, in the names of two nominees: Abington and Wynford, at offshore broker dealers, including "Broker-Dealer 1" and, "Broker-Dealer 2."

22. Ciapala also collected documents from Individual A, including copies of passports and/or other proof of identification for the nominee accounts, stock purchase agreements, and proofs of payment, in order to facilitate the deposits.

23. Once Blacklight deposited these shares, Individual A undertook a campaign to promote the stock, in an attempt to pump and dump it, including by disseminating a June 2015

hard-mailer promotion to investors in the United States.

24. During this pump-and-dump, Individual A and Ciapala were able to sell 88,373 EMSF shares from the Abington account for proceeds of approximately $100,000, and 178,900 shares from Wynford accounts for proceeds of approximately $270,000. All of these sales were unregistered.

25. Although Individual A held no shares of EMSF in his name, was not an officer or director of EMSF, and had no written or verbal authorization from any of the nominees that held EMSF shares, Ciapala and Blacklight took all of Individual A's instructions, including instruction concerning trade orders, stock transfers, and money movements.

26. Ciapala and Blacklight communicated with Individual A on encrypted messaging apps, and understood him to be directing the trading in the Abington and Wynford accounts. To give the transactions a veneer of legitimacy, Ciapala required Individual A to send written instructions to Blacklight using an email address that appeared to be owned by the shareholders.

27. Ciapala understood those emails were, in fact, coming from Individual A. For example, various emails indicate that Ciapala understood that Individual A, and not the shareholders, was sending the written instructions.

**B.   Ciapala's and Blacklight's Manipulative Trading of EMSF Securities**

28. In or about late June 2015, when Individual A's attempt to pump and dump EMSF stock petered out, Ciapala suggested that Individual A work with "Individual B" (a U.S. citizen who resided in the United States during the charged conduct), whom Ciapala viewed as having expertise in trading microcap securities, so that the price of EMSF could be maintained at a certain level, which would help Individual A sell EMSF shares.

29. Individual B told Individual A that he had clients that sought to purchase, at a

discount, liquid microcap stock. Individual B stated that his clients would only purchase securities priced over $1.

30. Individual B, Individual A and Ciapala therefore actively monitored the market and frequently executed trades through various brokerage accounts, including accounts maintained by Blacklight and other accounts located in the United States, in order to ensure EMSF's share price was maintained at the requisite level, but without drastic rises in the price.

31. From July, 2015 to through the end of October, 2015, the accounts collectively purchased approximately 970,000 EMSF shares and sold approximately 150,000 EMSF shares.

32. Their trading also aimed to defend the price of EMSF stock against short sellers. Moreover, their trading endeavored to create volume so that the Funds would be comfortable buying multiple blocks of EMSF stock, knowing there was sufficient demand and liquidity for them to sell the stock at a profit, and that Individual A, Individual B and Ciapala would maintain the market price. (As alleged below, Blacklight facilitated the sale of at least 4 million EMSF shares for proceeds of at least $1,035,000 through private DVP sales to the Funds.)

33. Individual B and Individual A, with assistance from Ciapala using accounts maintained by Blacklight, engaged in this manipulative activity throughout the summer of 2015.

34. Individual B and Individual A frequently communicated via instant messages and "chats" as they engaged in manipulative trading, with Individual B instructing Individual A when and how much to bid for a stock.

35. Individual B often directed Ciapala to engage in manipulative trades using accounts under Blacklight's control, as indicated by trading records and chat transcripts referring to trading by Ciapala (a/k/a "Ken" or "Kenneth").

36. For example, on June 25, 2015, Individual B and Individual A discussed via

messages a plan to support the price of EMSF stock with Ciapala's assistance:

> 4:52:23 PM [Individual B]: you can use kenneth for bid support and use your online trading platform speed or [a broker-dealer] for running at offers
> 4:52:31 PM [Individual B]: follow?
> 4:52:34 PM [Individual A]: yea
> \*\*\*
> 5:28:09 PM [Individual B]: need size
> 5:28:11 PM [Individual B]: shown
> 5:28:25 PM [Individual A]: kenneth trying its hard dealing with [Broker-Dealer 1]
> 5:28:28 PM [Individual A]: they don't listen to anything
> 5:28:29 PM [Individual B]: 1.18 and at 1.15
> 5:28:41 PM [Individual B]: ok its ok for now
> 5:29:02 PM [Individual B]: but i really would like to run at the 1.21's
> 5:29:12 PM [Individual B]: maybe later for now we are ok.

37. On July 27, 2015, Individual B instructed Individual A:

> 4:29:17 PM [Individual B]: just after open.. lets have kenneth put 5000 shares on bid @1.32
> 4:29:33 PM [Individual B]: so dont give the order yet
> 4:29:38 PM [Individual B]: but just preparing you
> 4:29:45 PM [Individual A]: k
> 4:31:26 PM [Individual A]: want bid now?
> 4:31:38 PM [Individual B]: yes
> 4:32:34 PM [Individual B]: same thing
> 4:32:48 PM [Individual A]: same thing?
> 4:39:57 PM [Individual B]: yes market makers are holding on
> 4:40:45 PM [Individual B]: is kenneth in the market?
> 4:40:53 PM [Individual B]: and if so which market maker
> 4:40:53 PM [Individual A]: he confirmed

38. Later that day, Individual B instructed Individual A: "Please have Kenneth put in a bid 10k shares at 1.36….show size." Individual A confirmed that he had done so, and 40 minutes later exchanged the following with Individual B:

> 9:44:05 PM [Individual A]: [Ciapala] said this is the last order he is taking on ems
> 9:44:08 PM [Individual A]: he is pissed
> 9:44:11 PM [Individual B]: why
> 9:44:20 PM [Individual A]: he syas [sic] its market manipulation
> 9:44:21 PM [Individual A]: thats what is sole purpose is
> 9:44:29 PM [Individual B]: why because you wanted to buy
> 9:44:36 PM [Individual B]: placing bid and then cancelling
> 9:44:37 PM [Individual B]: you bought

9:44:44 PM [Individual B]: lolol he is full of shit

39. About a month later, on August 24, 2015, Individual B messaged Individual A:

10:59:12 [Individual B]: so tomo[rrow] Im on plane until 130pm
10:59:20 [Individual B]: so i need you guys to maintain price
10:59:29 [Individual B]: i already told kenneth

40. And, on August 28, 2015, Individual B and Individual A exchanged the following messages:

6:41:57 PM [Individual B]: please ask kenneth to put a bid in
6:42:05 PM [Individual A]: where?
6:42:18 PM [Individual B]: 300@ 1.37
***
6:45:16 PM [Individual B]: please confirm bid
6:45:29 PM [Individual A]: confirmed
6:45:38 PM [Individual B]: he confirmed it
6:45:41 PM [Individual A]: yes

41. Between June 1 and October 12, 2015, Blacklight and Ciapala entered buy orders for EMSF stock at the direction of Individual A or Individual B that resulted in over 450 executed buys at prices ranging from $.925 to $2.25, helping to ensure the share price remained above $1.

42. Ciapala entered the buy orders, despite understanding that Individual A and Individual B were in the business of microcap stock manipulation and were manipulating the stock price of EMSF.

43. On the days that Blacklight and Ciapala entered these trades, other investors in the United States bought EMSF stock at the manipulated prices.

44. Often the buy orders were placed when the price of EMSF stock was dropping.

45. For example, on August 6, 2015 EMSF stock opened at $1.05 and began to fall. By approximately 10:22 am, it had dropped to $0.98, and by 10:40 am it was at $0.93. A minute later, the Wynford account purchased 1,100 shares at $0.94, then an additional 300 shares at $1,

stabilizing the price, then continuing to buy throughout the day, driving the stock price up to $1.18 by market close.

46. In connection with this scheme, from about June 25 to October 11, 2015, Wynford accounts controlled by Blacklight at Broker-Dealer 1 and Broker-Dealer 2 sold the Funds at least 4 million EMSF shares to clients of Individual B for proceeds of at least $1,035,000 through private DVP sales that cleared through and/or were deposited in, accounts at U.S. broker-dealers.

47. Ciapala and Blacklight profited by getting compensated for the services they provided their clients, including depositing and trading stock, sending wires, as well as from fees for the use of nominee entities and nominee directors of those entities.

## FIRST CLAIM FOR RELIEF

### Violations of Section 9(a)(2) of the Exchange Act
### (Against Ciapala and Blacklight)

48. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47.

49. Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)] makes it unlawful for any person, directly or indirectly, to effect, alone or with one or more other persons, a series of transactions in any security other than a government security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

50. Ciapala and Blacklight, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in EMSF securities creating actual or apparent active trading in EMSF securities, or raising the price of

EMSF securities, for the purpose of inducing the purchase or sale of EMSF securities by others.

51. By virtue of the foregoing, Ciapala and Blacklight violated, and, unless restrained and enjoined, will continue violating, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## SECOND CLAIM FOR RELIEF

### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (Against Ciapala and Blacklight)

52. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47.

53. Ciapala and Blacklight, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities: with scienter, employed devices, schemes, or artifices to defraud; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

54. By virtue of the foregoing, Ciapala and Blacklight violated and, unless restrained and enjoined, will continue violating, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

## THIRD CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Against Ciapala and Blacklight)

55. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47.

56. Ciapala and Blacklight, directly or indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, or

of the facilities of a national securities exchange, in connection with the purchase or sale of securities, employed devices, schemes and artifices to defraud, and engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon investors.

57. By reason of the foregoing, Ciapala and Blacklight violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)].

## FOURTH CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against Ciapala and Blacklight)

58. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47.

59. EMSF shares constitute "securities" within the meaning of Section 2(a)(l) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

60. At all relevant times, EMSF shares that the Defendants sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

61. Ciapala and Blacklight, singly or in concert, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

62. By reason of the foregoing, Ciapala and Blacklight violated and, unless enjoined, will again violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## FIFTH CLAIM FOR RELIEF

**In the Alternative to the Second Claim for Relief,
Aiding and Abetting Violation of Sections 17(a)(1) and (3) of the Securities Act
(Against Ciapala and Blacklight)**

63. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47.

64. Individual A and Individual B, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities: with scienter, employed devices, schemes, or artifices to defraud; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

65. Ciapala and Blacklight, directly or indirectly, provided knowing and substantial assistance to persons who directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, with scienter: employed devices, schemes, or artifices to defraud; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

66. By reason of the foregoing, Ciapala and Blacklight aided and abetted violations of, and unless enjoined, will again aid and abet violations of, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3).

## SIXTH CLAIM FOR RELIEF

**In the Alternative to the Third Claim for Relief,
Aiding and Abetting Violation of Section 10(b) of the Exchange Act
and Rules 10b-5(a) and (c)
(Against Ciapala and Blacklight)**

67. The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 47.

68. Individual A and Individual B, directly or indirectly, singly or in concert, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, employed devices, schemes and artifices to defraud, and engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon investors.

69. Ciapala and Blacklight, directly or indirectly, provided knowing and substantial assistance to persons who directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, employed devices, schemes and artifices to defraud, and engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon investors.

70. By reason of the foregoing, Ciapala and Blacklight aided and abetted violations of, and unless enjoined, will again aid and abet violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Enter a Final Judgment permanently restraining and enjoining Ciapala and Blacklight from violating Sections 5(a), 5(c) and 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77e(a),

77e(c) and 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)];

## II.

Enter a Final Judgment ordering Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon;

## III.

Enter a Final Judgment imposing civil money penalties upon Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Prohibiting Defendants, pursuant to Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)], from participating in an offering of penny stock; and

## V.

Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: January 2, 2020
       New York, New York

 

*/s/ M P Berger /PG*
Marc P. Berger
Sanjay Wadhwa
Michael D. Paley
Judith A. Weinstock
Paul G. Gizzi
Kristine Zaleskas
New York Regional Office
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
  COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0077 (Gizzi)
Email: gizzip@sec.gov