**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

            - against -

KENNETH CIAPALA, and
BLACKLIGHT, S.A.,

                   Defendants.

ECF Case

No. 20 Civ. 0008 (PGG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION TO INTERVENE AND FOR A COMPLETE STAY

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
Attorney for the United States
      of America

Noah Solowiejczyk
Vladislav Vainberg
Assistant United States Attorneys

   *- Of Counsel -*

## PRELIMINARY STATEMENT

The United States of America, by and through the United States Attorney for the Southern District of New York ("the Government"), respectfully submits this memorandum in support of its application (i) to intervene in the above-captioned case, pursuant to Rule 24 of the Federal Rules of Civil Procedure, and (ii) to stay this matter in its entirety until the conclusion of the parallel criminal case, *United States v. Kenneth Ciapala et al.*, 19 Cr. 874 (GBD) (the "Criminal Case"), except that such a stay should not apply to any motion for default judgment to be filed by the Securities and Exchange Commission (the "SEC") against defendant Blacklight, S.A. ("Blacklight").

The Criminal Case arises from the identical set of facts and circumstances that underlie this action. As a result, a full stay is especially appropriate because any exchange of discovery would be asymmetrical and would merely allow the defendant to circumvent the criminal discovery rules and improperly tailor his defense in the Criminal Case. In similar situations, courts in this Circuit and others have often entered a complete stay of parallel civil actions when there is a related criminal prosecution with overlapping defendants and facts, even over a defendant's objection. *See, e.g.*, *SEC v. Wey*, 15 Civ. 7116 (PKC) (S.D.N.Y. June 9, 2016) (after Government's motion for partial stay of discovery, and over objection of multiple defendants, implementing full stay of discovery, with the exception that SEC would produce testimony transcripts that had been produced in criminal case); *SEC v. Durante et al.*, 15 Civ. 9874 (RJS) (S.D.N.Y. Mar. 23, 2016) (after Government's initial motion for partial stay of discovery, fully staying discovery and proceedings in the matter); *SEC v. Shkreli*, *et al.*, 15 Civ. 7175 (KAM), 2016 WL 1122029, at **2-7 (E.D.N.Y. Mar. 22, 2016) (granting, over defendants' opposition, a full stay); *SEC v. Dubovoy*, 15 Civ. 6076 (D.N.J. Jan. 29, 2016); *SEC v. One or More Unknown*

1

*Purchasers of Securities of Global Indus., Ltd.*, No. 11 Civ. 6500 (RA), 2012 WL 5505738, at *3

(S.D.N.Y. Nov. 9, 2012) (granting U.S. Attorney's Office request for full stay of discovery for

six months over defendant's objection while criminal investigation was proceeding but prior to

any criminal charge); *Harris v. Nassau County et al.*, 2014 U.S. Dist. LEXIS 94554 at *10

(E.D.N.Y. 2014); *SEC v. Nicholas*, 569 F. Supp. 2d 1065, 1070 (C.D. Cal. 2008).

For the reasons that follow, the Government respectfully requests that this Court enter an

order staying this action until the completion of the Criminal Case, while reserving the right for

the SEC to file a motion for default judgment against Blacklight. Defendant Ciapala consents to

the Government's motion and the SEC take no position with respect to the Government's

motion. As is described further below, Blacklight was served in this case and failed to file a

timely answer or other responsive pleading.

## FACTUAL BACKGROUND

This case and the parallel Criminal Case arise out of the same underlying facts.   The

criminal indictment 19 Cr. 874 (GBD) (the "Indictment")[1]  charges Ciapala, Blacklight, and co-

defendant Ulrik Debo with securities fraud and wire fraud offenses, as well as charging Ciapala

and Blacklight with money laundering offenses.   The charges against Ciapala and Blacklight

relate to Ciapala's and Blacklight's involvement in facilitating various stock manipulation

schemes that spanned years and involved microcap stocks traded on the over-the-counter

("OTC") market.   Ciapala was a citizen of the United Kingdom and of Switzerland and founder

and co-principal of Blacklight at all times relevant to the Indictment. (Indictment ¶ 2).

Blacklight was a Swiss corporation based in Geneva that purported to offer asset management

---

[1]  A copy of the Indictment is annexed hereto as Exhibit A.

and trustee services to its clients but that, in reality, executed stock manipulation schemes relating to publicly traded shares of multiple issuers and facilitated the laundering of proceeds derived from these stock manipulation schemes. (Indictment ¶ 1).

As the Indictment alleges, Ciapala, Blacklight and Debo, as well as others known and unknown, conspired to defraud the investing public by orchestrating and facilitating multiple stock manipulation schemes, commonly referred to as "pump and dump" schemes. (Indictment ¶ 11).   In order to perpetrate the stock manipulation schemes, Ciapala, Blacklight, and their co-conspirators secretly amassed beneficial ownership of substantially all of the shares of certain publicly traded companies, and thereafter manipulated the price and demand for these stocks through the release of materially false information to the investing public and through manipulative trading activity.   (Indictment ¶ 12).   Ciapala, Blacklight, and their co-conspirators thereafter sold out of their secretly-amassed positions in these stocks at inflated prices at the expense of the investing public. (Indictment ¶ 12).

Ciapala and Blacklight are specifically alleged to have furthered the stock manipulation scheme by, among other things: (i) helping various Blacklight clients, including Debo, to obscure their beneficial ownership and control of all or substantially all of the shares of companies whose securities they sought to manipulate; (ii) establishing nominee entities that were registered in the names of various third parties to hold the shares that were, in truth and in fact, beneficially owned and controlled by the stock manipulation scheme participants; (iii) opening bank and brokerage accounts in the names of the nominee entities to trade shares owned by the nominee entities through various brokerage accounts; and (iv) exercising trading authority over the nominee entities' shares and directing brokers to execute trades on behalf of the nominee entities in furtherance of the stock manipulation scheme.   (Indictment ¶ 14). The nominee entities

3

established by Blacklight were used by the scheme participants to secretly amass beneficial

ownership and control of all or substantially all of the stock of the issuers whose stock the

conspirators planned to manipulate.   (Indictment ¶ 16).   In order to obscure the ownership

interests of its clients, Ciapala and Blacklight caused these shares to be held in the names of

multiple nominee entities and caused the nominee entities' holdings to be structured in such a

way so as to ensure that no single nominee entity held more than five percent of the outstanding

stock of any of the issuers. (Indictment ¶ 16).

　　　　After Ciapala, Blacklight, and their co-conspirators had obtained control of all or

substantially all of the shares of an issuer, the scheme participants manipulated the trading price

and volume for the stock of the issuer. (Indictment ¶ 18).   Such stock manipulation included,

among other things, causing promotional materials to be distributed to the investing public that

contained exaggerated and, at times, false claims about the issuer, and which materials concealed

from the investing public the fact that these promotional materials were financed and created at

the direction of those who beneficially owned and controlled substantially all of the shares of the

relevant issuers. (Indictment ¶ 18).   In addition, Ciapala, Blacklight, and their co-conspirators

engaged in manipulative trading activity that included, among other things, engaging in "match"

trades in which they caused multiple nominee entities they controlled to trade with one another

to create the appearance of trading volume and demand for the stock at issue.   Ciapala,

Blacklight, and their co-conspirators also took steps to ensure any given stock that they were

manipulating closed "in the green" – meaning that the stock's closing price at the end of the

trading day exceeded the opening price at the beginning of the trading day – by engaging in manipulative trading at or near the close of the trading day. (Indictment ¶ 19).

One of the companies whose publicly traded shares Ciapala, Blacklight and their co-conspirators schemed to manipulate is identified in the Indictment as "Company-1," a publicly traded company that was based in Pennsylvania and purported to develop mobile technology connecting healthcare providers and consumers to medical transport companies.   Shares of Company-1 traded on OTC market in the United States. (Indictment ¶ 6).

With respect to Company-1, the Indictment alleges that Ciapala and Blacklight participated in a scheme with other co-conspirators ("CC-1" and "CC-2") to manipulate the trading price and volume of the stock of Company-1. (Indictment ¶ 21).   In connection with that scheme, CC-2 used multiple nominee entities that had been established by Ciapala through Blacklight to hold shares of Company-1 and CC-2 directed Ciapala to execute trades on behalf of these nominee entities through brokerage accounts that Ciapala and Blacklight controlled. Ciapala knew that the nominee entities utilized by CC-2 to trade in Company-1's shares were, in reality, all controlled by CC-2 despite the fact that these entities were purportedly owned by separate individuals. (Indictment ¶ 21).   Ciapala also knew that the trade orders he was causing to be executed in the multiple Blacklight nominee entity accounts were all at the direction of CC-2. (Indictment ¶ 21).

Subsequently, Ciapala introduced CC-2 to CC-1 for the purpose of CC-1 acting as a "trading specialist" in return for a fee. In that role, CC-1 assisted CC-2 in directing trades in a manner that manipulated the share price and trading volume of Company-1's stock.   Ciapala and Blacklight thereafter continued to execute trades on behalf of CC-2's nominee entities in furtherance of the scheme as directed by CC-2.   Ciapala and other employees of Blacklight

caused wires to be sent to CC-1 that constituted CC-1's fees for his role in the scheme.   These

fees were wired to CC-1 from CC-2's accounts held at Blacklight. (Indictment ¶ 22).   At the

time he caused the wire transfers to CC-1 to occur, Ciapala knew that the purpose of these

payments to CC-1 was to compensate CC-1 for his role in manipulating the share price and

trading volume of Company-1's stock. (Indictment ¶ 22).

     The Indictment further details how Ciapala and Blacklight laundered the millions of

dollars of illicit proceeds that were generated through the various stock manipulation schemes.

(Indictment ¶ 31).   This laundering of proceeds by Ciapala and Blacklight included assisting

scheme participants in obtaining their share of the proceeds by remitting the funds to the scheme

participants in a manner designed to conceal the source of these funds or the identity of the

recipients thereof, including by using fabricated invoices to justify wire transfers from accounts

held in the names of nominee entities controlled and operated by Blacklight to other bank

accounts controlled by the scheme participants. (Indictment ¶ 31).

     The Complaint filed by the SEC in this action (Dkt. No. 1) (hereinafter the "SEC

Complaint")[2]  relates to materially identical conduct with respect to the Company-1 stock

manipulation scheme.   In the SEC Complaint against Ciapala and Blacklight, Company-1 is

named as EMS Find,Inc. (ticker symbol EVTP), which is described as a Nevada corporation

headquartered outside of Philadelphia, Pennsylvania and that purported to be developing a

"mobile application to connect health care professionals and patients with medical transport."

(SEC Complaint ¶¶ 1, 11).   The SEC Complaint alleges that a client of Blacklight (referred to

as "Individual A"), became part of a purchaser group that gained control of all the outstanding

---

[2]  A copy of the SEC Complaint is annexed hereto as Exhibit B.

shares of EMSF in or about 2014. (SEC Complaint ¶ 13).   Beginning in April 2014, Individual A worked to transfer all of EMSF's shares held in the names of EMSF's original shareholders to a control group consisting of the CEO of EMSF, the CEO's spouse, as well as to nominee entities set up for Individual A by Blacklight and Ciapala.   (SEC Complaint ¶ 14).   By the summer of 2015, all of the outstanding shares of EMSF were held and controlled by the control group that Individual A had assembled, including nominee entities that Individual A held at Blacklight, and these shares were then deposited at broker dealers by Blacklight. (SEC Complaint ¶¶ 17-21).   Individual-A and others thereafter engaged in a stock manipulation scheme of EMSF, which included a promotional campaign, and manipulative trading that was facilitated, in part, through Ciapala and Blacklight.   (SEC Complaint ¶¶ 22-27).

    The SEC Complaint further details that, in or about June 2015, Individual-A still controlled a large block of EMSF shares after the first stock manipulation scheme had concluded.   Ciapala thereafter suggested that Individual A should work with Individual B whom Ciapala viewed as an expert in trading microcap securities in order for Individual A to maintain the price of EMSF shares in order to assist Individual A in selling the shares Individual A still controlled. (SEC Complaint ¶ 28).   Individual B informed Individual A that if the share price remained over $1 then Individual B had clients who would purchase the shares. Individual A, Individual B, and Ciapala thereafter actively monitored the share price of EMSF and executed trades, including through accounts maintained by Blacklight, in order to ensure that EMSF's share price was maintained at the requisite level.   (SEC Complaint ¶ 30).   The SEC Complaint alleges, among other things, that as part of the scheme Individual A and Individual B, with the assistance from Ciapala using accounts maintained by Blacklight, engaged in manipulative trading activity in EMSF shares.   (SEC Complaint ¶¶ 32-35). The Complaint goes

7

on to detail chats between Individual A and Individual B in which they discuss manipulative trading activity and how Ciapala and Blacklight helped facilitate this trading. (SEC Complaint ¶¶ 36-46).   The SEC Complaint alleges that Ciapala and Blacklight profited from the scheme because they were compensated for the services they provided to their clients, including depositing and trading stocks, and sending wires and fees for the use of nominee entities provided by Blacklight. (SEC Complaint ¶ 47).

## PROCEDURAL BACKGROUND

On December 5, 2019 a grand jury sitting in Southern District of New York returned a criminal indictment 19 Cr. 874 (GBD) charging Kenneth Ciapala and Blacklight S.A., as well as co-defendant Ulrik Debo with conspiracy to commit securities fraud (Count One), conspiracy to commit wire fraud (Count Two), three counts of substantive securities fraud (Counts Three through Five), one count of substantive wire fraud (Count Six), one count of conspiracy to commit money laundering (Count Seven), and one count of substantive concealment money laundering (Count Eight).   Ciapala was arrested in the United Kingdom on December 11, 2019, pursuant to a U.S. request for his provisional arrest.   The Indictment was unsealed on January 2, 2020.   Ciapala was subsequently extradited to the United States on or about July 30, 2020, and presented and arraigned on or about that date. The criminal case against Ciapala remains pending.   Blacklight has not yet appeared in the Criminal Case.   The Government is in the process of seeking to serve Blacklight with the Indictment through the Mutual Legal Assistance Treaty with Switzerland.

The SEC filed the SEC Complaint on January 2, 2020.   On January 2, 2020, the SEC also filed a request for an issuance of summons with respect to Ciapala and Blacklight (Dkt. No. 4, 5).   On August 6, 2020, the SEC filed a waiver of the service of summons with respect to

8

Ciapala indicating that Ciapala must file an answer within sixty days of August 4, 2020, *i.e.*

October 5, 2020. (Dkt. No. 17).    With respect to Blacklight, as the SEC informed the Court in a

letter dated August 4, 2020:

> On May 4, the Commission made a request for assistance with
> service on Blacklight to the appropriate authorities in Switzerland
> pursuant to Article 22 of the 1973 U.S.-Swiss Confederation Mutual
> Legal Assistance Treaty (the "Treaty"), but service was not effected
> under the Treaty. Subsequently, the Commission staff
> communicated further with Swiss authorities concerning
> appropriate methods of service on Swiss corporations under Swiss
> law, and the Commission has been advised that service by mail on
> Blacklight by Swiss authorities constitutes valid service. The
> Commission is waiting for proof of such mail service from Swiss
> authorities and will file that proof of service when it is received.

(Dkt. No. 16).    On August 13, 2020, the SEC filed a return of executed summons providing

proof of service on Blacklight in Switzerland through the aforementioned service by mail on or

about July 10, 2020, with service being complete under Swiss law seven days later on July 17,

2020.    (Dkt. No. 20). Blacklight's deadline to file an answer was August 7, 2020**,** and

Blacklight did not file an answer or any other responsive pleading by that deadline.    As the SEC

stated in its letter of August 4, 2020 to the Court, "[t]he Commission . . . anticipate[s] seeking a

default judgment against Blacklight if it does not respond to the Complaint and Summons in a

timely fashion." (Dkt. No. 16).

## **ARGUMENT**

The Government's requests to intervene and for a complete stay of this civil action

should be granted.    If this case were to proceed, there would be a risk of significant interference

with the Criminal Case.    A complete stay would prejudice no party to this civil action; would

prevent the circumvention of important statutory limitations on criminal discovery and avoid

asymmetrical discovery; and would preserve the Court's resources because many of the issues

presented by the civil action will be resolved in the Criminal Case.    Importantly, Ciapala

consents to the motion for a complete stay and the SEC takes no position with respect to the

motion.    Moreover, Blacklight, despite having been served, has not appeared in this case and

failed to file a timely answer or other responsive pleading.    Thus, no party to the litigation is

objecting to the motion.    It is thus appropriate to grant a complete stay, with the exception of

not staying the SEC from filing a motion for a default judgment against Blacklight in light of

Blacklight's failure to file an answer.

## I.    THE GOVERNMENT SHOULD BE GRANTED PERMISSION TO INTERVENE

Under Rule 24(a)(2) of the Federal Rules of Civil Procedure, anyone may intervene as of

right in an action when the applicant "claims an interest relating to the property or transaction

that is the subject of the action" and the applicant "is so situated that 'disposing of the action may

as a practical matter impair or impede the movant's ability to protect its interests. . . .'"

Alternatively, Rule 24(b)(2) provides for permissive intervention when the movant "has a claim

or defense that shares with the main action a common question of law or fact." The Government

respectfully submits that its application satisfies both of these provisions given the effect this

civil proceeding would have on the Criminal Case and the similarity of claims and facts between

the parallel proceedings.

As a general rule, courts "have allowed the government to intervene in civil actions —

especially when the Government wishes to do so for the limited purpose of moving to stay

discovery." *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1009 (E.D.N.Y. 1992;

*see also SEC v. Credit Bancorp.*, 297 F.3d 127, 130 (2d Cir. 2002). The Government has a

"discernible interest in intervening in order to prevent discovery in a civil case from being used

to circumvent the more limited scope of discovery in the criminal matter." *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988).

As an initial matter, intervention is warranted because the Government's interests in upholding the public interest in enforcement of the criminal laws cannot be protected adequately by the existing parties in this civil litigation, none of whom represents the Government's interests with respect to the investigation and enforcement of federal criminal statutes. *See Bureerong v. Uvawas*, 167 F.R.D. 83 (C.D. Cal. 1996) ("[T]he Government's prosecutorial and investigative interest is not adequately protected by any of the civil parties . . . . Clearly neither the plaintiff or the defendants have this identical interest."). Debo does not oppose the Government's motion to intervene and the SEC takes no position.

Moreover, if this action were to proceed in advance of the Criminal Case, it would impair and impede the Government's ability to protect its interests in the enforcement of federal criminal law.   This civil case and the Criminal Case arise from the same alleged pump-and-dump scheme perpetrated by the defendants and other co-conspirators, as is described above. Holding a civil trial before a criminal trial would create the possibility that there will be two trials covering the same fraudulent acts, as the facts surrounding the defendants' perpetration of the pump-and-dump scheme are central to both this civil action and the Criminal Case.   This raises the probability that witnesses will be unnecessarily burdened by having to testify twice.

In light of these circumstances, the Government respectfully submits that its application to intervene should be granted.

11

## II.     A COMPLETE STAY OF THIS ACTION IS APPROPRIATE

### A.     Applicable Law

This Court has the inherent power to stay civil proceedings in the interests of justice pending the completion of a parallel criminal trial. *See Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) ("[A] court may decide in its discretion to stay civil proceedings . . . when the interests of justice seem . . . to require such action.") (internal citations and quotations omitted). "'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). In evaluating whether to grant such a stay, courts in this Circuit consider:

> (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interest of the court; and (6) the public interest.

*See, e.g.*, *Tuzman*, No. 15 Civ. 7057 (AJN), at 2 (quoting *Louis Vuitton*, 676 F.3d at 99). "Balancing these factors is a case-by-case determination, with the basic goal being to avoid prejudice." *Volmar Distrib., Inc. v. New York Post Co., Inc.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993). But the factors "can do no more than act as a rough guide for the district court as it exercises its discretion" and do not replace the Court's "studied judgment as to whether the civil action should be stayed based on the particular facts before it and the extent to which such a stay would work a hardship, inequity, or injustice to a party, the public or the court." *Louis Vuitton*, 676 F.3d

at 99. The Court's "decision ultimately requires and must rest upon a particularized inquiry into the circumstances of, and the competing interests in, the case." *Id.* (quotation marks omitted).

### B.    Discussion

Application of each of these factors here weighs in favor of the stay sought by the Government.

#### 1.    *The Extent of the Overlap*

That the criminal and civil cases involve essentially identical facts and issues weighs heavily in favor of a stay. "The most important factor at the threshold is the degree to which the civil issues overlap with the criminal issues." *Volmar Distrib.*, 152 F.R.D. at 39 (citing Judge Milton Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 203 (S.D.N.Y. 1989)); *see also Parker v. Dawson*, No. 06 Civ. 6191 (JFB), 2007 WL 2462677, at *4 (E.D.N.Y. Aug. 27, 2007) (same); *United States v. One 1964 Cadillac Coupe DeVille*, 41 F.R.D. 352, 353 (S.D.N.Y. 1966) ("Where both civil and criminal proceedings arise out of the same or related transactions the government is ordinarily entitled to a stay of all discovery in the civil case until disposition of the criminal matter.").

Here, as described above, even a cursory examination of the Indictment and the SEC Complaint makes clear that the alleged wrongdoing with respect to the securities market manipulation scheme involving Company-1 (identified with ticker symbol EMSF in the SEC Complaint) is essentially the same.   While the Indictment is broader in its scope and alleges additional criminal conduct beyond the Company-1 scheme involving other stock manipulation schemes that Ciapala and Blacklight were involved in dating back to in or about 2013, both the Indictment and the SEC Complaint overlap almost entirely with respect to the conduct relating to the Company-1 stock manipulation scheme. As to that fraudulent scheme, the Indictment and the

SEC Complaint involve the same alleged fraudulent scheme perpetrated by Ciapala and

Blacklight, albeit the SEC Complaint sets out certain details of that scheme in more detail than

the Indictment.   While the SEC Complaint references the roles of Individual A and Individual B

in the scheme, the Indictment details the actions of these same co-conspirators in connection

with the scheme, referring to them instead as CC-1 and CC-2.   The cases involve virtually

identical facts, witnesses and issues and name the same defendants (albeit the Indictment also

names Debo but not in connection with the Company-1 scheme). As a result, this factor weighs

heavily in favor of a stay. *See, e.g.*, *Shkreli*, 2016 WL 1122029, at *4; *Tuzman,* 15 Civ. 7057

(AJN), at 3.

### 2.      The Status of the Criminal Case

The return of an indictment in the Criminal Case is also a factor that weighs in favor of a

stay. "[T]he strongest argument for granting a stay is where a party is under criminal

indictment." *Shkreli*, 2016 WL 1122029, at *5 (quotation and citation omitted). Indeed, "[t]he

weight of authority in this Circuit indicates that courts will stay a civil proceeding when the

criminal investigation has ripened into an indictment." *In re Par Pharm, Inc. Sec. Litig*., 133

F.R.D. 12, 13 (S.D.N.Y. 1990); *see also Trustees of Plumbers and Pipefitters Nat'l Pension

Fund, et al. v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) ("A stay

of a civil case is most appropriate when a party to the civil case has already been indicted for the

same conduct for two reasons: first, the likelihood that a defendant may make incriminating

statements is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in

the civil case is reduced since the criminal case will likely be quickly resolved."). Thus, this factor also militates strongly in favor of a stay.

### 3.      The Potential Prejudice to the Parties

No prejudice will result from the complete stay requested by the Government. The SEC has indicated that it takes no position as to the Government's motion.   The SEC will not be adversely impacted by a complete stay, as such a stay will allow the SEC to conserve its resources (as well as the resources of the Court) by avoiding needless duplicative litigation of many of issues presented by the civil action that may be resolved in the criminal case

With respect to Ciapala, granting a stay of the civil case to permit the Criminal Case to proceed to its conclusion would actually benefit Ciapala, since granting a stay of the civil case would for now obviate forcing him to make the choice between being prejudiced in the civil case by the assertion of his Fifth Amendment rights or being prejudiced in the Criminal Case if he waived those rights.   A complete stay will also allow the defendant, like the SEC, to conserve resources and avoid needless duplicative litigation of materially identical issues in two separate proceedings.   Finally, because Blacklight has not appeared in the pending civil action before this Court and has failed to file an answer or other responsive pleading, it is not prejudiced by a complete stay of these civil proceedings.   Moreover, preserving the ability for the SEC to move for a default judgment while still otherwise granting a complete stay of the proceedings will not prejudice Blacklight, particularly in light of the fact that the SEC had already stated its intention to file a default judgment motion in its prior letter to the Court.

### 4.      The Interests of the Court

Considerations of judicial economy also weigh in favor of granting a stay. Issues common to both cases can be resolved in the criminal proceeding, thereby simplifying the civil

action. *Cf. SEC v. Contorinis*, No. 09 Civ. 1043 (RJS), 2012 WL 512626, at *2 (S.D.N.Y. Feb. 3,

2012) ("Courts in this district have consistently found that a defendant convicted of securities

fraud in a criminal proceeding is collaterally estopped from relitigating the underlying facts in a

subsequent civil proceeding."); *Global Indus.*, 2012 WL 5505738, at *4 ("[T]he Civil Case is

likely to benefit to some extent from the Criminal Case no matter its outcome."); *LaBianca*, 801

F. Supp. at 1010-11 (recognizing judicial economy as a factor to be considered). Because the

Criminal Case's outcome will likely affect the conduct, scope, and result of the civil proceeding,

thereby streamlining issues in this matter and avoiding duplication of effort and judicial

resources, this factor favors the Government's application for a complete stay.

### 5.    The Public Interest

Finally, the Government and the public have an important interest in ensuring that civil

discovery is not used to circumvent the well-founded restrictions that pertain to criminal

discovery — restrictions that, *inter alia*, preserve the truth-seeking functions of the criminal

process by restraining the ability of criminal defendants to tailor testimony, suborn perjury,

manufacture evidence or intimidate witnesses. *See United States v. Percevault*, 490 F.2d 126,

129 (2d Cir. 1974) (noting that the Jencks Act, 18 U.S.C. § 3500, "represents a legislative

determination that access to a witness' statements could be useful in impeaching a witness but

was not intended to be utilized in preparation for trial"); *United States v. McCarthy*, 292 F. Supp.

937, 942 (2d Cir. 1968) ("The claimed need to see such statements in advance in order to prepare

to rebut them is little more than open notice of an intention to tailor testimony to fit the

statement."); *Nicholas*, 569 F. Supp. 2d at 1070 (the criminal rules were "purposefully limited so

as to prevent perjury and manufactured evidence, to protect potential witnesses from harassment

and intimidation, and to level the playing field between the government and the defendant, who

would be shielded from certain discovery by the Fifth Amendment").

In *Tuzman*, Judge Nathan outlined three principal Government interests justifying a stay

of discovery of civil proceedings while parallel criminal proceedings are pending:

> First, broad disclosure of the essentials of the prosecution's case
> may lead to perjury and manufactured evidence. Second, revelation
> of the identity of prospective witnesses may create the opportunity
> for intimidation. Third, criminal defendants may unfairly surprise
> the prosecution at trial with information developed through [civil]
> discovery, while the self-incrimination privilege would effectively
> block any attempts by the Government to discover relevant evidence
> from the defendants.

*Tuzman*, No. 15 Civ. 7057 (AJN), at 3-4 (internal citations and quotations omitted). Based on

these concerns, judges in this District have frequently granted Government requests to limit

discovery in a parallel civil action in order to prevent the civil discovery rules from being

subverted into a device for improperly obtaining discovery in the criminal proceeding. *See, e.g.*,

*Tuzman*, No. 15 Civ. 7057 (AJN) (granting stay sought by Government); *SEC v. Beacon Hill*

*Asset Management LLC*, No. 02 Civ. 8855 (LAK), 2003 WL 554618, at *1 (S.D.N.Y. Feb. 27,

2003) (in granting government's motion to stay, court noted: "The principal concern with respect

to prejudicing the government's criminal investigation is that its targets might abuse civil

discovery to circumvent limitations on discovery in criminal cases."); *Phillip Morris Inc. v.*

*Heinrich*, No. 95 Civ. 328 (LMM), 1996 WL 363156, at *19 (S.D.N.Y. June 28, 1996) (granting

stay motion because if "civil discovery is not stayed, the criminal investigation will be

prejudiced, as the Defendants may have an opportunity to gain evidence to which they are not

entitled under criminal discovery rules."); *Bd. of Governors of the Federal Reserve System* v.

*Pharaon*, 140 F.R.D. 634, 639 (S.D.N.Y. 1991) ("'A litigant should not be allowed to make use

17

of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal trial.'") (quoting *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1952)).

Indeed, the rationale underlying a stay is even stronger in an indicted matter, given that a defendant in a charged criminal case will likely invoke his Fifth Amendment rights in the civil case and not participate in the very discovery process he seeks to use affirmatively. *See, e.g.*, *SEC v. Chakrapani*, 2010 WL 2605819 (S.D.N.Y. June 29, 2010) (inviting the Government to renew its motion to stay discovery if the defendant intends to invoke the Fifth Amendment if noticed for a deposition); *Nicholas*, 569 F. Supp. 2d at 1070 (noting when granting full stay that "[t]he specter of parties and witnesses invoking their Fifth Amendment rights would render discovery largely one-sided; the SEC would produce scores of documents and witness testimony only to be precluded from gathering reciprocal discovery from the defendants").

A denial of the Government's requested stay would therefore result in asymmetrical discovery, pursuant to which Ciapala would be able to obtain statements from relevant witnesses through depositions and use other discovery mechanisms such as requests for admission and interrogatories to obtain information from the SEC, while the SEC would be unable to use any of these discovery mechanisms to obtain information from Ciapala because of his assertion of his Fifth Amendment rights. Such asymmetry is both unfair and a circumvention of the criminal discovery rules that govern when criminal defendants are entitled to obtain prior statements of the Government's trial witnesses. *See* 18 U.S.C. § 3500(b) (prior statements of Government witnesses must be made available after the witnesses have testified on direct examination).

Therefore, in order to avoid circumvention of the criminal discovery restrictions, including the provisions that are designed to prevent defendants from tailoring their testimony

and obtaining asymmetrical discovery, and because Ciapala will not in any way be prejudiced in preparing and defending himself, this factor weighs in favor of the Government's application.

Finally, it bears noting that Judge Castel recently granted a very similar motion filed by the Government to intervene and for a complete stay in the pending SEC civil action against co-defendant Ulrik Debo.   *See SEC v. Debo*, 20 Civ. 0006 (PKC), Dkt. No. 20.   In that case, as is true here, Debo consented to the motion for a complete stay and the SEC took no position.

## **<u>CONCLUSION</u>**

For these reasons, the Government respectfully requests that its application to intervene and for a complete stay of this matter, other than reserving the right of the SEC to file a motion for a default judgment against Blacklight, be granted. A proposed stay order is annexed hereto as Exhibit C.

      Dated:  New York, New York
                October 2, 2020

                            Respectfully submitted,

                            AUDREY STRAUSS
                            Acting United States Attorney

By:    <u> /s/ Noah Solowiejczyk        </u>
                            Noah Solowiejczyk
                            Vladislav Vainberg
                            Assistant United States Attorneys
                            One Saint Andrew's Plaza
                            New York, New York 10007
                            Telephone: (212) 637-2473/1029